## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHNJUAN WHITE,** | : | **CIVIL ACTION NO. 1:22-CV-1241** |
| **as Administrator of the Estate** | : | |
| **of Jimmy King, Deceased,** | : | **(Judge Conner)** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DAUPHIN COUNTY,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

### MEMORANDUM

Plaintiff JohnJuan White brings this lawsuit under 42 U.S.C. § 1983, as administrator of the estate of his late uncle, Jimmy King, who died while in pretrial detention at Dauphin County Prison.  White alleges King's death resulted from violations of state and federal law committed by defendants Dauphin County and Warden Gregory Briggs ("Dauphin County defendants");[1] several correctional officers ("CO defendants");[2] and the prison's designated medical provider, PrimeCare Medical, Inc.; PrimeCare's CEO Thomas Weber, Esquire; Corporate Medical Director Dr. Carl Hoffman; and numerous employees ("PrimeCare

---

[1] White names Warden Briggs in his individual and official capacities.

[2] CO defendants include correctional officers Michael McClurg, Jr.; Jairo Ventura; and Christopher Pacheco in their individual capacities.  (See Doc. 27 ¶ 15).  White also named CO Rodriguez (given name unknown) and 10 John and Jane Doe COs, none of whom are included in the CO defendants' motion.

defendants").[3]  Each tranche of defendants moves to dismiss White's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim.  We will grant in part and deny in part the pending motions.

## I.    <u>Factual Background & Procedural History</u>

King was arrested on August 7, 2020, and charged with retail theft, reckless driving, and related offenses.  (<u>See</u> Doc. 27 ¶ 19).  He could not post his $10,000 bail and thus was detained at Dauphin County Prison.  (<u>See</u> <u>id.</u> ¶ 20).  Two days after the arrest, King was assaulted by his cellmate, Michael Caputo, and sustained serious bodily injury; the incident was captured on camera.  (<u>See</u> <u>id.</u> ¶ 21).  Prison medical staff noted King suffered a gash above his left eye and bruised or broken ribs, but White claims they sent King back to his cell without providing medical care or properly examining him to rule out traumatic brain injury ("TBI").  (<u>See</u> <u>id.</u> ¶¶ 22-25).  White alleges the prison issued a report after the August 9 assault that does not mention King's injuries.  (<u>See</u> <u>id.</u> ¶ 44).  According to the amended complaint, King—"a 50-year-old male with a past medical history significant for hypertension," for which he took two medications, (<u>see</u> <u>id.</u>, Ex. A)—filed a medical request slip on August 10 complaining of a severe headache, a primary symptom of TBI, but

[3] Weber and Dr. Hoffman are named in their individual and official capacities.  PrimeCare's named employees include Tykeisha Metz, Katelin Wright, Joseph Macut, Jessica Nye, Tiffany Long, Addonna Thomas, Shayne Goodman, Kayla Zeiders-Heichel, Adam Boerman, William Young, Garrett Rosas, Angela Barnett, Cheree Sultzbach, Johanna Riedel, Jessica Glasper, Sharon Christie, Melissa Barbosa, Mildred Montalvo, Douglas Eash, Susan Deloe, Tia Drabich, Stephanie Dietz, Katie Summerville, Tracy P., and Gina F.—all of whom are named in their individual capacities, along with 10 John and Jane Doe medical employees.  Of these, Long, Thomas, Goodman, Barnett, Glasper, Barbosa, Drabich, Tracy P., and Gina F. are not included in the PrimeCare Defendants' motion.  (<u>See</u> Doc. 28).

medical staff once again failed to provide care or testing, (see id. ¶ 26). They purportedly failed a third time on August 12, after King reported experiencing shortness of breath, another TBI symptom. (See id. ¶ 27).

On August 14, CO Rodriguez restrained King and wrote him up for a disciplinary infraction after King poured an unknown liquid on another inmate, Sylvester Strand. (See id. ¶ 28). Someone—Strand, "his cellmate,"[4] CO Rodriguez, or one of the CO defendants—struck King in the face and head with a tablet or iPad during the incident, causing a contusion above his right eye. (See id. ¶ 29). White alleges King received no medical treatment following the assault, (see id. ¶ 30), though a medical report notes staff X-rayed his head and found no abnormalities, (see id., Ex. A). King sought medical attention five days later for severe headaches, chest pain, breathing problems, and sleeping difficulties; he said he felt "like he was bleeding into his brain." (See id. ¶¶ 31, 32 (quoting Ex. A)). Medical staff allegedly told King there was nothing they could do for him. (See id. ¶ 33). White avers King's headaches grew so severe by the next day that he began screaming from the pain and again requested medical attention but received none. (See id. ¶¶ 34-35).

Medical staff evaluated King at 1:00 a.m. on August 21 and noted his status as "normal." (See id., Ex. A). Two hours later, King was rushed to the hospital after being discovered face down and unresponsive in a pool of vomit on the floor of his cell. (See id. ¶ 36). Hospital staff intubated King and administered a CT scan,

---

[4] It is not immediately clear whether White means Strand's cellmate or King's. White elsewhere argues it was reasonably foreseeable Caputo and others would assault King on August 14. (See Doc. 41 at 9-10).

which revealed an acute subdural hematoma.  (See id. ¶ 37).  King exhibited no brain activity.  (See id.)  Emergency medical technicians and correctional officers who accompanied King to the hospital informed his treating physicians he had been struck in the head with a tablet several days earlier and had complained about headaches.  (See id. ¶¶ 38-39).  White claims the prison failed to include these details in a report it issued following the August 14 incident.  (See id. ¶¶ 45, 48).

King died on August 29, 2020.  (See id. ¶ 40).  His autopsy revealed contusions and bilateral swelling on his upper and lower eyelids and right upper lip.  (See id. ¶ 41).  Dauphin County's coroner ruled King's death a homicide; the cause of death was complications from TBI.  (See id. ¶ 42).  The coroner's report sets forth a chronology of events, including information provided by Warden Briggs and others that King "was struck four days prior to being found unresponsive."  (See id. ¶¶ 43, 45).  Dauphin County officials held a press conference soon after King's death, at which they ruled out bringing homicide charges against Caputo for the August 9 assault, deeming it self-defense.  (See id. ¶ 46).  No criminal charges have been filed in connection with King's death.  (See id.)

White believes the failure to accurately document King's injuries is evidence of an ongoing conspiracy to cover up the circumstances of his death.  (See id. ¶¶ 47, 49; see also id. ¶¶ 128-130).  White commenced the instant lawsuit on August 29, 2022, and subsequently filed an amended complaint.  Therein, he accuses all defendants of deliberate indifference to the foreseeable risk of harm King faced after the first assault.  (See id. ¶¶ 50-52).  Highlighting the deaths of at least 20 inmates at the prison between 2008 and 2019, including five "in 2021 alone," White

alleges Dauphin County has a longstanding policy or practice of condoning or acquiescing in the violation of pretrial detainees' constitutional rights.  (See id. ¶¶ 82-95; see also id. ¶¶ 106-115).  He likewise accuses the PrimeCare defendants of systematically denying inmates adequate medical care.  (See id. ¶¶ 97-104; see also id. ¶¶ 117-126).

White raises the following fourteen claims:

- **Against the CO defendants:**  Fourteenth Amendment substantive-due-process violations pursuant to Section 1983 for failure to protect (Count I), excessive force (Count II), and failure to intervene (Count III), and common-law assault and battery (Count X).

- **Against the Dauphin County defendants:**  Municipal liability pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), for excessive force and "cover up" (Count V).

- **Against Warden Briggs and the CO defendants:**  Supervisory liability for excessive force (Count VII).

- **Against all PrimeCare defendants:**  Substantive-due-process violation pursuant to Section 1983 for denial of adequate medical care (Count IV), supervisory liability for denying medical care (Count VIII), and common-law negligence, gross negligence, and vicarious liability (Count XI).

- **Against PrimeCare Medical, Weber, and Dr. Hoffman:**  Monell liability for denying medical care (Count VI).

- **Against PrimeCare Medical:**  Common-law corporate negligence and gross negligence (Count XII).

- **Against all individually named defendants:**  Civil conspiracy pursuant to Section 1983 (Count IX).

- **Against all defendants:**  Wrongful death (Count XIII) and survivor action (Count XIV) pursuant to 42 PA. CONS. STAT. §§ 8301, 8302.

Defendants move to dismiss White's amended complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The motions are fully briefed and ripe for disposition.

## II.    Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. See FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a

plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a

claim must be separated; well-pleaded facts are accepted as true, while mere legal

conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578

F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual

allegations, it must determine whether they are sufficient to show a "plausible claim

for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550

U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 556 U.S. at 678.

## III.  **Discussion**

The pending Rule 12(b)(6) motions raise numerous challenges to White's

amended complaint, chief among them that the pleading is long on supposition and

short on fact.  Defendants challenge the sufficiency of the pleadings for all counts

except Count XII, as to which PrimeCare does not seek dismissal "at this time."

(See Doc. 33 at 3).  Warden Briggs and the CO defendants invoke qualified

immunity in response to White's individual-capacity claims under Section 1983;

they and Dauphin County also raise an immunity defense to White's state-law

claims pursuant to Pennsylvania's Political Subdivision Tort Claims Act

("PSTCA"), 42 PA. CONS. STAT. § 8541 *et seq.*  (See Doc. 34 at 17-18, 19-20; Doc. 35

at 19-21).  We begin with these immunity defenses.

### A.      Immunity

#### 1.      *Qualified Immunity*

Qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted.  Pearson v. Callahan, 555 U.S. 223, 243-45 (2009).  Liability will not attach if a reasonable actor could have believed the challenged conduct complied with settled law.  See id. at 244; see also Springer v. Henry, 435 F.3d 268, 280 (3d Cir. 2006).  The doctrine cloaks government officials with "immunity from suit rather than a mere defense to liability," see Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted), and "ensure[s] that insubstantial claims against government officials [will] be resolved prior to discovery," Pearson, 555 U.S. at 231-32 (second alteration in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987)).  The defense generally "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Defendants bear the burden of establishing qualified immunity.  See Beers–Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).  Faced with such a defense, a court must consider two distinct inquiries: whether, viewing the facts alleged in a light most favorable to the plaintiff, defendants violated a constitutional right and, if so, whether the right was "clearly established" at the time of the alleged violation.  Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232).  We may begin our analysis with either prong.  See Pearson, 555 U.S. at 237.

Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law.  See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, a plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  See Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).  Defendants ostensibly do not dispute that they are state actors.  Our sole inquiry is whether White has alleged a constitutional violation.

White's amended complaint falls well short of plausibly alleging either Warden Briggs or the CO defendants violated King's constitutional rights.  White asserts violations of King's right to due process as a pretrial detainee under the Fourteenth Amendment that could constitute cruel and unusual punishment in violation of the Eighth Amendment if alleged by a convicted prisoner.  See Jacobs v. Cumberland County, 8 F.4th 187, 193-94 (3d Cir. 2021) (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)).  Defendants do not meaningfully dispute that using excessive force against a prisoner or failing to intervene or protect that prisoner from foreseeable harm might rise to the level of a constitutional violation that is clearly established in this circuit.  See, e.g., Hudson v. McMillian, 503 U.S. 1, 6-7 (1992) (citing Whitley v. Albers, 475 U.S. 312 (1986)) (excessive force); Smith v. Mensinger, 293 F.3d 641, 650-52 (3d Cir. 2002) (failure to intervene); Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)) (failure to

protect), <u>abrogated on other grounds by</u> <u>Mack v. Yost</u>, 968 F.3d 311, 319 n.7 (3d Cir. 2020), <u>as recognized in</u> <u>Williams v. Del. Cnty. Bd. of Prison Inspectors</u>, 844 F. App'x 469, 472-73 (3d Cir. 2021) (nonprecedential).  They contend, however, White fails to set forth any facts supporting even an inference that they used excessive force against King when he was assaulted on August 9 or August 14, or that they could have intervened in time to prevent the harm he suffered.  (<u>See</u> Doc. 34 at 20; Doc. 35 at 19-20).  We agree with defendants.

White does not suggest the August 9 attack independently supports his claims against Warden Briggs or the CO defendants, and we see no basis for concluding otherwise.  White's Section 1983 claims stem directly from the August 14 assault, but he fails to plausibly allege any of the CO defendants were even on duty that day, let alone that they personally struck King in the face with a tablet, refused to intervene to prevent the attack despite having a reasonable opportunity to do so, or knew King was at risk of being assaulted and were deliberately indifferent to his risk.  <u>See</u> <u>Smith</u>, 293 F.3d at 650-51; <u>Bistrian</u>, 696 F.3d at 371-72.  Moreover, it is unlikely any correctional officer could have foreseen King instigating the August 14 fight by pouring an unknown liquid on another inmate, (<u>see</u> Doc. 27 ¶¶ 28-29), whose motivation to immediately exact retribution is obvious.  Absent plausible averments suggesting personal culpability on the part of the CO defendants, White's Section 1983 claims against them cannot overcome their right to qualified immunity.

White similarly fails to adequately allege how Warden Briggs can be held liable for the August 14 assault.  Warden Briggs was not personally involved in the

attack; thus, the only basis for supervisory liability would be if he knew his subordinates would use excessive force against King and acquiesced in the violation or if he maintained a policy or custom of ignoring attacks on prisoners by correctional officers.  See Parkell v. Danberg, 833 F.3d 313, 330 (3d Cir. 2016) (citing Santiago, 629 F.3d at 129 n.5).  But Warden Briggs cannot be held liable as a supervisor for acts of his subordinates that do not amount to constitutional violations, see McCracken v. Fulton County, No. 3:19-CV-1063, 2020 WL 2767577, at *9 (M.D. Pa. May 28, 2020) (Conner, C.J.) (citing Santiago, 629 F.3d at 130), and White has not plausibly asserted any correctional officer assaulted King.  Accordingly, Warden Briggs also is entitled to qualified immunity.  White's failure to plead an Eighth or Fourteenth Amendment violation attributable to Warden Briggs or the CO defendants compels us to grant their motions to dismiss Counts I, II, III, and VII.

## 2.   *PSTCA*

The PSTCA grants immunity from liability to local agencies and their employees "for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." See 42 PA. CONS. STAT. § 8541.  The statute's principal purpose "is to limit governmental exposure to tort liability for its acts."  Sphere Drake Ins. Co. v. Phila. Gas Works, 782 A.2d 510, 515 (Pa. 2001) (citing Lory v. City of Philadelphia, 674 A.2d 673, 675-76 (Pa. 1996)).  The requisites for invoking immunity under the PSTCA differ depending on the tort (*i.e.*, negligent vs. intentional) and the defendant (*i.e.*, agency vs. employee).  Given these distinctions, we address the viability of Dauphin

County's immunity defense separately from that of Warden Briggs and the CO defendants.

### a.    *Immunity of Dauphin County*

The PSTCA unquestionably embodies the General Assembly's "intent . . . to shield government from liability." Jones v. SEPTA, 772 A.2d 435, 440 (Pa. 2001). That said, there are instances in which a local agency will not be immune under the Act. See 42 PA. CONS. STAT. § 8542. For municipal liability to be abrogated, the allegedly tortious conduct must satisfy two preconditions and fall into one of nine exemption categories. First, the tort must be one that would be recoverable from a defendant not having a defense of governmental immunity under Section 8541, or official immunity under Section 8546. See id. § 8542(a)(1). The injury also must have been "caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties"; the statute does not encompass "acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct." See id. § 8542(a)(2). If a plaintiff's claim satisfies these two requirements, then local agencies and their employees may be liable if the claim involves vehicular liability; the agency's care, custody, or control of personal or real property; trees, traffic controls, and street lighting; utility service facilities; streets; sidewalks; the care, custody, or control of animals; or sexual abuse. See id. § 8542(b).

White cannot satisfy either precondition to abrogate PSTCA immunity with respect to his state-law claims against Dauphin County. The torts underlying White's wrongful death and survival actions against the county—assault and

battery—are intentional torts, which, for purposes of the PSTCA, are synonymous with "willful misconduct."  See Burkhart v. Knepper, 310 F. Supp. 2d 734, 744 (W.D. Pa. 2004) (citing Kuzel v. Krause, 658 A.2d 856, 859 (Pa. Commw. Ct. 1995)).  As well, none of the PSTCA's nine enumerated, categorical exceptions apply to White's claims.  We will grant Dauphin County's motion to dismiss Counts XIII and XIV with prejudice.

### b.    Immunity of Warden Briggs and CO Defendants

The PSTCA exempts from its protective scope any employee whose act constitutes "a crime, actual fraud, actual malice or willful misconduct."  See 42 PA. CONS. STAT. § 8540.  Willful misconduct is more than recklessness or deliberate indifference.  See Bright v. Westmoreland County, 443 F.3d 276, 287 (3d Cir. 2006) (citing Williams v. City of Philadelphia, 569 A.2d 419, 421-22 (Pa. Commw. Ct. 1995)).  It includes only such conduct that shows an employee "desired to bring about the result that followed" or "was aware that it was substantially certain to follow, so that such desire can be implied."  See Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006) (quoting Renk v. City of Pittsburgh, 641 A.2d 389, 293 (Pa. 1994)).  White has not adequately pled Warden Briggs or the CO defendants engaged in any willful misconduct that brought about King's injuries.  The PSTCA immunizes them from liability to the same extent as Dauphin County with respect to Counts XIII and XIV, as well as White's claim for assault and battery (Count X).  We will dismiss these counts without prejudice.

**B.**   **Count V: Section 1983 – <u>Monell</u> – Excessive Force and Cover Up (Dauphin County Defendants)**

White advances a theory of municipal liability against Dauphin County and Warden Briggs in his official capacity for allegedly establishing a policy or failing to properly train correctional officers in a way that led to the excessive use of force against King.  (<u>See</u> Doc. 27 ¶¶ 81-89).  White also claims the county and Warden Briggs maintain a policy, practice, or custom of covering up unlawful actions of correctional officers and medical staff.  (<u>See</u> <u>id.</u> ¶¶ 90-95).

**1.**   ***Official-Capacity Claim***

As a threshold matter, a court may dismiss official-capacity claims against individual defendants when identical claims are brought against the agency that employs them.  <u>See</u> <u>Cuvo v. De Biasi</u>, 169 F. App'x 688, 693 (3d Cir. 2006) (nonprecedential) (citing <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-66 (1985)); <u>see also</u> <u>Graham</u>, 473 U.S. at 167 n.14.  The rationale behind this approach is that "a lawsuit against public officers in their official capacities is functionally a suit against the public entity that employs them."  <u>See</u> <u>Cuvo</u>, 169 F. App'x at 693 (citing <u>McMillian v. Monroe County</u>, 520 U.S. 781 (1997)).  The official-capacity claim against Warden Briggs is functionally identical to the claim against Dauphin County, and White offers no compelling justification for retaining both.  The court will therefore grant Warden Briggs' motion to dismiss Count V.

**2.**   ***Municipal Liability***

Municipal liability arises when a governmental entity causes an employee to violate another's constitutional rights by an official custom or policy.  <u>See</u> <u>Monell</u>,

436 U.S. at 690-94; Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998).  To

establish liability, a plaintiff must identify the challenged policy or custom, attribute

it to the municipality itself, and show a causal link between execution of the policy

or custom and the injury suffered.  See Losch v. Borough of Parkesburg, 736 F.2d

903, 910 (3d Cir. 1984).  A policy exists "when a 'decisionmaker possess[ing] final

authority to establish municipal policy with respect to the action' issues an official

proclamation or edict."  Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir.

1990) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 481 (1986)).  A custom may be

formed when "'the practices of state officials [are] so permanent and well settled' as

to virtually constitute law."  Id. (quoting Monell, 436 U.S. at 691).

Municipalities may be held liable for constitutional violations that result from

inadequately training their employees if the failure to train constitutes a custom of

the municipality.  See Connick v. Thompson, 563 U.S. 51, 61 (2011).  The failure

must reflect "deliberate indifference to the [constitutional] rights of persons with

whom [municipal employees] come into contact."  Colburn v. Upper Darby

Township, 946 F.2d 1017, 1028 (3d Cir. 1991) (quoting City of Canton v. Harris, 489

U.S. 378, 388 (1989)).  A showing of deliberate indifference requires that

"(1) municipal policymakers know that employees will confront a particular

situation; (2) the situation involves a difficult choice or a history of employees

mishandling; and (3) the wrong choice by an employee will frequently cause

deprivation of constitutional rights."  Carter v. City of Philadelphia, 181 F.3d 339,

357 (3d Cir. 1999).  Plaintiffs typically must show a "pattern of similar

[constitutional] violations" to prove deliberate indifference in the failure-to-train context.  See Connick, 563 U.S. at 63.[5]

### a.   *Excessive Force*

White's claim against Dauphin County with respect to the excessive use of force exhibits the same fatal flaw as his individual claims against Warden Briggs and the CO defendants.  He has not sufficiently pled that King's injuries resulted from any correctional officer's use of force, let alone that such force was inflicted pursuant to official prison policy or resulted from inadequate training.  Thus, we will grant the county's motion to dismiss this aspect of Count V.

### b.   *Cover Up*

Courts approach cover-up claims in one of two ways depending on how a plaintiff styles their allegations.  The first approach assesses the alleged cover up specifically as an effort to deny the "right of access to the courts" guaranteed by the Fourteenth Amendment.  See Estate of Smith v. Marasco, 318 F.3d 497, 511 (3d Cir. 2003) (collecting cases); see also Jutrowski v. Township of Riverdale, 904 F.3d 280, 294 (3d Cir. 2018).  A state official violates the Fourteenth Amendment by "wrongfully and intentionally conceal[ing] information crucial to a person's ability to obtain redress through the courts," if (1) they do so purposely to frustrate that right and (2) their concealment engenders delay that "substantially reduce[s] the

---

[5] A single constitutional violation could suffice to establish municipal liability if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that policymakers reasonably can be charged with deliberate indifference.  See City of Canton v. Harris, 489 U.S. 378, 390 (1989).  White does not present a single-violation theory.

likelihood" the plaintiff can obtain relief to which they are entitled.  See id. (quoting Swekel v. City of River Rouge, 119 F.3d 1259, 1262-63 (6th Cir. 1997)).  In other words, plaintiffs raising this species of constitutional violation must allege conduct that either prevented them from bringing a lawsuit or rendered their "access to the court ineffective or meaningless."  See id. (citing Swekel, 119 F.3d at 1261-64).  The second approach simply considers the allegation part and parcel of a general conspiracy to violate some other constitutional right.  See, e.g., Simonton v. Tennis, No. 1:09-CV-233, 2011 WL 941406, at *2-3 (M.D. Pa. Mar. 16, 2011) (Conner, J.), aff'd 437 F. App'x 60, 63 (3d Cir. 2011) (nonprecedential).

White alleges Dauphin County maintained a policy of covering up unlawful acts supposedly committed by correctional officers and medical staff, though he does so within his overarching claim of municipal liability for condoning the excessive use of force, a distinct constitutional violation.  (See Doc. 27 ¶¶ 90-93, 95). White does not specifically aver Dauphin County purposely endeavored to prevent him from vindicating his or King's rights in court, or that the alleged concealment engendered delay or reduced his likelihood of obtaining relief.  Consequently, to the extent he intends to predicate his cover-up claim on the denial of access to the courts, his claim is not well pled and must be dismissed.

The amended complaint elsewhere identifies "acts in furtherance of the conspiracy," including, inter alia, "covering-up [sic] assaults by Correctional Officers and/or inmates . . . and ignoring or covering up the failure of [the PrimeCare defendants] to provide adequate medical care to the inmates."  (See id.

¶ 129).  White situates these allegations in Count IX, his Section 1983 conspiracy claim.  We address that claim in Part III.D.

### C.    Counts IV, VI, and VIII: Section 1983 – <u>Monell</u> – Denial of Adequate Medical Care (All PrimeCare Defendants)

White asserts individual-capacity, supervisory-liability, and municipal-liability claims against PrimeCare, Weber, Dr. Hoffman, and more than two dozen members of Dauphin County Prison's medical staff for denying King adequate medical care.  (<u>See</u> Doc. 27 ¶¶ 74-80, 96-104).  He also names Weber and Dr. Hoffman in their official capacities in Count VI, but because that claim is derivative of White's claim against PrimeCare, we will dismiss both defendants from that count.  <u>See</u> <u>Cuvo</u>, 169 F. App'x at 693.

### 1.    *Individual-Capacity Claim*

Pretrial detainees may assert a Section 1983 claim for inadequate medical care under the Fourteenth Amendment as a violation of their right to due process. <u>See</u> <u>Natale v. Camden Cnty. Corr. Facility</u>, 318 F.3d 575, 581 (3d Cir. 2003); <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 668 (3d Cir. 1988).  The protections afforded to pretrial detainees under the Fourteenth Amendment are "at least as great as" those guaranteed to convicted prisoners under the Eighth Amendment. <u>See</u> <u>Natale</u>, 318 F.3d at 581 (quoting <u>City of Revere v. Mass. Gen. Hosp.</u>, 463 U.S. 239, 244 (1983)).  To establish an Eighth Amendment claim arising from deprivation of medical care, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." <u>Id.</u> at 582 (citing <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999)).  A serious medical

need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention." Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).  Additionally, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment." Id. (citation omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." See Farmer, 511 U.S. at 837.  Mere differences of opinion between the prison's medical staff and the inmate regarding diagnosis or treatment rendered does not support a constitutional violation.  See Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988) (citing Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)); see also McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981).  Courts are "reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." Palakovic v. Wetzel, 854 F.3d 209, 228 (3d Cir. 2017) (quoting United States ex rel. Walker v. Fayette County, 599 F.2d 573, 575 (3d Cir. 1979)).  Federal courts generally defer to prison medical staff with respect to diagnosing and treating prisoners, and "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a

question of sound professional judgment." Id. (quoting Inmates of Allegheny Cnty.

Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)).

White asserts in conclusory fashion that each individual PrimeCare

defendant was deliberately indifferent to King's injuries because they failed to

properly diagnose his TBI or "provide treatment for his condition." (See Doc. 27

¶¶ 78-79). King's injuries plainly constituted a serious medical need when

considered with the benefit of hindsight, and the symptoms he complained of—

severe headaches, chest pain, breathing problems, sleeping difficulties, and a

potential brain bleed, (see id. ¶¶ 31, 32)—provided the facts necessary to infer his

needs were serious. But the exhibit White attached to his amended complaint notes

prison medical staff took an X-ray of King's head and identified no abnormalities.

(See Doc. 27, Ex. A).[6] That medical report undermines White's claim the PrimeCare

Defendants were aware of King's risk of TBI and consciously disregarded it, as

opposed to simply having a difference of opinion over how best to address his

symptoms beyond continuing to treat his underlying chronic hypertension, which

they might have earnestly believed would ameliorate his headaches. (See id. ¶ 33;

see also id., Ex. A). At best, White's allegations amount to a tragic case of medical

---

[6] Defendants dispute White's allegation that they provided no treatment by
pointing out that he originally pled they "prescrib[ed] *inappropriate* treatment—an
x-ray, Tylenol, and blood pressure medication—for his condition." (See Doc. 27 ¶ 64
(emphasis added); see also Doc. 33 at 2, 9). White correctly rejoins that an amended
complaint supersedes prior pleadings, rendering them a legal nullity absent specific
reference or adoption. (See Doc. 39 at 8 (citing W. Run Student Hous. Assocs., LLC
v. Huntington Nat'l Bank, 712 F.3d 165, 171 (3d Cir. 2013))). The amended
complaint makes no reference to Tylenol—but Exhibit A clearly states defendants
administered an X-ray and found nothing abnormal.

malpractice—but malpractice does not equal a constitutional violation.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976).  White has not plausibly alleged the PrimeCare defendants knew or "dr[e]w the inference" that King's medical needs were serious, and that omission is fatal to any claim of deliberate indifference.  See Farmer, 511 U.S. at 837.

### 2.   *Supervisory and Municipal Liability*

A private corporation providing medical services within a prison system may be liable for constitutional violations resulting from a policy or custom.  See Palakovic, 854 F.3d at 232 (citing Natale, 318 F.3d at 583-84).  However, "the absence of an underlying constitutional violation defeats a custom-or-policy theory of liability" because "municipal liability cannot lie 'if there is no violation in the first place.'"  McCracken, 2020 WL 2767577, at *9 (quoting Mulholland v. Gov't Cnty. of Berks, 706 F.3d 227, 238 n.15 (3d Cir. 2013)).  The same is true of claims predicated on supervisory liability.  See id. (citing Santiago, 629 F.3d at 130).  White's failure to plead a plausible claim of deliberate indifference as to any individual PrimeCare defendant requires dismissal of his derivative Monell and supervisory-liability claims against PrimeCare Medical, Weber, and Dr. Hoffman.

### D.   Count IX: Section 1983 – Conspiracy (All Individually Named Defendants)

White alleges the individually named defendants conspired to violate King's rights by, *inter alia*, downplaying and ignoring his injuries and covering up the assaults and lack of adequate medical care.  (See Doc. 27 ¶ 129).  A Section 1983 claim for conspiracy "rises and falls" with the underlying constitutional violation.

See Fantone v. Latini, 780 F.3d 184, 191 (3d Cir. 2015), as amended (Mar. 24, 2015)

(citing Perano v. Township of Tilden, 423 F. App'x 234, 239 (3d Cir. 2011)

(nonprecedential)).  White's conspiracy claim fails because he has not plausibly

alleged defendants violated his constitutional rights.  We will grant all defendants'

motions to dismiss Count IX.

### E.     Count XI: Negligence, Gross Negligence, and Vicarious Liability (All PrimeCare Defendants)

White charges the individual PrimeCare Defendants with negligence, and he

seeks to hold PrimeCare vicariously liable for its employees' conduct.  (See Doc. 27

¶¶ 135-141).  Pennsylvania law defines medical negligence, or medical malpractice,[7]

as "the unwarranted departure from generally accepted standards of medical

practice resulting in injury to a patient, including all liability-producing conduct

arising from the rendition of professional medical services."  Toogood v. Owen J.

Rogal, D.D.S., P.C., 824 A.2d 1140, 1145 (Pa. 2003) (citing Hodgson v. Bigelow, 7 A.2d

338 (Pa. 1939)).  The existence of an injury, by itself, does not prove negligence.  See

Mitchell v. Shikora, 209 A.3d 307, 315 (Pa. 2019) (citations omitted).  Plaintiffs in

---

[7] Although White categorizes Count XI under the general banner of "negligence," it is clear his claim arises out of King's relationship with the prison's medical staff and thus sounds in medical malpractice.  See Ditch v. Waynesboro Hosp., 917 A.2d 317, 322 (Pa. Super. Ct. 2007) (quoting Grossman v. Barke, 868 A.2d 561, 570 (Pa. Super. Ct. 2005)) (medical malpractice claims are distinguished from ordinary negligence claims based on two characteristics: (1) "medical malpractice can occur only within the course of a professional relationship" and (2) "claims of medical malpractice necessarily raise questions involving medical judgment").  White has filed certificates of merit in compliance with Pennsylvania Rule of Civil Procedure 1042.3, (see Docs. 19 through 19-29)—a prerequisite for medical malpractice actions in Pennsylvania, see Jackson v. United States, No. 1:20-CV-165, 2021 WL 5359161, at *3 (M.D. Pa. Nov. 17, 2021) (Conner, J.)—thus confirming the nature of his claims.

medical malpractice cases must instead "establish a duty owed by the [medical professional] to the patient, a breach of that duty. . . , that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm." Toogood, 824 A.2d at 1145 (quoting Hightower-Warren v. Silk, 698 A.2d 52, 54 (Pa. 1997)); see also Mitchell, 209 A.3d at 315. The negligent acts of medical professionals may be imputed to their employers on a theory of vicarious liability. See Green v. Pa. Hosp., 123 A.3d 310, 316 (Pa. 2015).

White avers that those PrimeCare defendants responsible for evaluating and treating him undertook or assumed a duty to provide adequate medical care for his injuries. (See Doc. 27 ¶ 137). Defendants allegedly breached that duty by failing to, *inter alia*, "recommend appropriate diagnostic testing and/or treatment for [King's] repeated head injuries," "recognize the significance of [King's] ongoing and worsening symptoms," "properly monitor [King]," "attempt to rule out subdural hematoma," and "properly treat" and "notice the signs and symptoms of" King's TBI. (See id. ¶ 136). White certifies, on the basis of a written statement provided by "an appropriate licensed medical professional," that defendants' conduct, or the conduct of those under certain defendants' supervision, "fell outside of acceptable professional standards" and resulted in King's death. (See, e.g., Doc. 19). White has stated a plausible claim for medical malpractice against the individually named defendants and their employer, PrimeCare.

Defendants contend White's failure to differentiate among them by alleging what they personally did or failed to do requires dismissal of his claim with prejudice. (See Doc. 33 at 16). We disagree. White accuses each individual

23

PrimeCare defendant of responding to King's injuries and symptoms in a manner falling below acceptable professional standards.  He claims King received inadequate treatment immediately after both the August 9 and 14 attacks, (see Doc. 27 ¶¶ 22-25, 30), and that medical staff failed to properly identify and treat King's TBI symptoms again and again despite King's complaints on August 10, 12, 19, and 20, (see id. ¶¶ 26-27, 30-35).  We can reasonably infer King's recurring—and increasingly desperate—pleas over those 11 days would have been heard by any PrimeCare medical staff on duty during that period.  Determining which individual defendants were on duty and interacted with King on those specific dates should become clear during discovery.

### F.  Counts XIII and XIV: Wrongful Death and Survival Action (All Defendants)

White asserts claims against all defendants under Pennsylvania's wrongful-death and survival statutes.  See 42 PA. CONS. STAT. §§ 8301, 8302.  Neither statute creates an independent cause of action; "rather, they are derivative in the sense that the substance of the claim derives from the injury to the decedent."  See McCracken, 2020 WL 2767577, at *10 (citing Pisano v. Extendicare Homes, Inc., 77 A.3d 651, 660 (Pa. Super. Ct. 2013) (quoting Kaczorowski v. Kalkosinski, 184 A. 663, 664 (Pa. 1936))).  Put differently, without an underlying tort, "there can be no wrongful-death or survival action."  Id. (citations omitted).

White's claims against the CO and Dauphin County defendants under Pennsylvania law sound in the torts of assault and battery, while his claims against the PrimeCare defendants sound in medical negligence.  Dauphin County is

immune from suit on these claims under the PSTCA, and we have dismissed
Warden Briggs and the CO defendants from these counts for pleading deficiencies
with respect to the underlying assault and battery torts.  In light of our conclusion
that White states a valid claim for medical malpractice against the PrimeCare
defendants, and given their decision not to challenge the corporate-negligence
claim, White's claims under Counts XIII and XIV survive their motion to dismiss.

### G.    Leave to Amend

Courts must generally grant leave to amend before dismissing civil rights
claims if a curative amendment is conceivable.  See Grayson v. Mayview State
Hosp., 293 F.3d 103, 108 (3d Cir. 2002).  The deficiencies identified in this
memorandum are primarily factual rather than legal in nature, the two exceptions
being White's duplicative official-capacity claims and Dauphin County's entitlement
to PSTCA immunity.  Curable amendment is conceivable as to the remaining
constitutional and state-law claims.  Accordingly, while we dismiss most of the
counts against these defendants pursuant to Rule 12(b)(6), we will do so without
prejudice and with leave to amend as noted herein.

## IV.    Conclusion

We will grant in part and deny in part defendants' motions to dismiss.  An
appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    September 29, 2023