### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHNJUAN WHITE,** | : | **CIVIL ACTION NO. 1:22-CV-1241** |
| **as Administrator of the Estate** | : | |
| **of Jimmy King, Deceased,** | : | **(Judge Conner)** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DAUPHIN COUNTY,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

### <u>MEMORANDUM</u>

Plaintiff JohnJuan White brings this lawsuit under 42 U.S.C. § 1983, as administrator of the estate of his late uncle, Jimmy King, who died while in pretrial detention at Dauphin County Prison.  White alleges King's death resulted from violations of state and federal law committed by defendants Dauphin County and Warden Gregory Briggs ("Dauphin County defendants");[1] several correctional officers ("CO defendants");[2] and the prison's designated medical provider, PrimeCare Medical, Inc.; PrimeCare's CEO Thomas Weber, Esquire; Corporate Medical Director Dr. Carl Hoffman; and numerous employees ("PrimeCare

---

[1] White names Warden Briggs in his individual capacity.  (See Doc. 74 ¶ 13).

[2] White originally named four correctional officers—Michael McClurg, Jr., Jairo Ventura, Christopher Pacheco, and Louis Rodriguez—in their individual capacities, along with 10 John and Jane Doe COs.  (See Doc. 27 ¶ 15).  He named them again in his second amended complaint, (see Doc. 74 ¶ 15), but has since agreed to dismiss McClurg and Pacheco from this action, (see Docs. 83, 98, 99).  Ventura—who is proceeding *pro se* after failing to oppose his prior counsel's motion to withdraw, (see Docs. 80-82, 90)—has not responded to the second amended complaint.  Rodriguez has timely filed an answer, (see Doc. 105), but presently does not seek dismissal.

defendants").[3]  We previously dismissed nearly all of White's claims against each tranche of defendants with leave to amend, which he has done.  Most defendants now move to dismiss White's second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim.  We will grant in part and deny in part the pending motions.

## I.   **Factual Background & Procedural History**

King was arrested on August 7, 2020, and charged with retail theft, reckless driving, and related offenses.  (See Doc. 74 ¶ 19).  He could not post his $10,000 bail and thus was detained at Dauphin County Prison.  (See id. ¶ 20).  Two days after his arrest, King was assaulted by his cellmate, Michael Caputo, and sustained serious bodily injuries; the incident was captured on camera.  (See id. ¶ 21).  Prison medical staff noted King suffered a gash above his left eye and bruised or broken ribs, but White claims they sent King back to his cell without providing medical care or properly examining him to rule out traumatic brain injury ("TBI").  (See id. ¶¶ 22-24).  White alleges the prison issued a report after the August 9 assault that does not mention King's injuries.  (See id. ¶ 51).

---

[3] Weber and Dr. Hoffman are named in their individual and official capacities. (See Doc. 74 ¶ 14).  PrimeCare's named employees include Tykeisha Metz, Katelin Wright, Joseph Macut, Jessica Nye, Tiffany Long, Addonna Thomas, Shayne Goodman, Kayla Zeiders-Heichel, Adam Boerman, William Young, Dr. Garrett Rosas, Angela Barnett, Cheree Sultzbach, Johanna Riedel, Jessica Glasper, Sharon Christie, Melissa Barbosa, Mildred Montalvo, Douglas Eash, Susan Deloe, Tia Drabich, Stephanie Dietz, Katie Summerville, Tracy P., and Gina F.—all of whom are named in their individual capacities, along with 10 John and Jane Doe medical employees.  (See id. ¶ 17).  Of these, Barbosa, Tracy P., and Gina F. are not included in the PrimeCare defendants' motions.  (See Docs. 87, 93).

According to the second amended complaint, King—"a 50-year-old male with a past medical history significant for hypertension," for which he took two medications, (see id., Ex. A at ECF 51)—filed a medical request slip on August 10 complaining of a severe headache, a primary symptom of TBI, (see id. ¶ 25). Medical staff X-rayed King's ribs and left orbital bone the next day but found no abnormalities, (see id. ¶ 26; see also id., Ex. A at ECF 51); they also attempted to check his blood pressure, but he refused, (see id., Ex. B at ECF 55; Ex. C at ECF 56). White claims an X-ray is "inadequate" to diagnose a TBI; instead, "a CAT scan of the brain/head" is required. (See id. ¶ 27). King reported experiencing shortness of breath, another TBI symptom, on August 12, but White asserts medical staff again "failed to order or conduct the appropriate test . . . to determine if there was any bleeding" in King's brain, and generally ignored his complaints and failed to treat him. (See id. ¶¶ 28, 29).

On August 14, CO Rodriguez restrained King and wrote him up for a disciplinary infraction after he saw King pour an unknown liquid on "another inmate."[4] (See id. ¶ 31). White claims that CO Rodriguez retaliated against King by striking him in the face and head with a prison-issued electronic tablet, causing a contusion above his right eye; the tablet subsequently "was listed as missing" during an inventory count. (See id. ¶¶ 30, 32, 33; see also id., Ex. C at ECF 57).[5]

---

[4] White previously identified the other inmate as Sylvester Strand. (See Doc. 27 ¶ 28).

[5] White cast a broader net in his prior pleadings, averring that the attacker was "either" Strand, "his cellmate," or one of the fourteen named and unnamed COs. (See Doc. 27 ¶ 29).

White alleges King received no medical treatment following the assault because he was attacked by a CO and not by an inmate, (see id. ¶ 34), though his medical chart notes staff attempted to check his vitals that same day and the next but he either refused or was noncompliant, (see id., Ex. C at ECF 56).  King sought medical attention five days later for severe headaches, chest pain, breathing problems, and sleeping difficulties; he said that "it felt like he was bleeding into his brain."  (See id. ¶¶ 36, 37 (quoting Ex. A at ECF 50)).  Medical staff gave King Motrin and Tylenol and then allegedly told the prison guards to whom he was complaining that there was "nothing more" they could do for him.  (See id. ¶¶ 38, 41; see also id., Ex. C at ECF 56-57).  White avers King's headaches grew so severe by the next day that he began screaming from the pain and again requested medical attention but received none.  (See id. ¶¶ 39-40, 42).

Medical staff evaluated King at 1:00 a.m. on August 21 and noted his status as "normal."  (See id., Ex. A at ECF 50).  Two hours later, King was rushed to the hospital after being discovered face down and unresponsive in a pool of vomit on the floor of his cell.  (See id. ¶ 43).  Hospital staff intubated King and administered a CT scan, which revealed an acute subdural hematoma.  (See id. ¶ 44).  King exhibited no brain activity.  (See id.)  Emergency medical technicians and correctional officers who accompanied King to the hospital informed his treating physicians he had been struck in the head with a tablet several days earlier and had complained about headaches.  (See id. ¶¶ 45-46).  White claims the prison failed to include these details, or CO Rodriguez's involvement, in a report it issued following the August 14 incident.  (See id. ¶¶ 52, 53, 55).

King died on August 29, 2020.  (See id. ¶ 47).  His autopsy revealed contusions and bilateral swelling on his upper and lower eyelids and right upper lip.  (See id. ¶ 48).  Dauphin County's coroner determined that King's death was a homicide, and that the cause of death was TBI.  (See id. ¶ 49).  The coroner's report sets forth a chronology of events, including information provided by Warden Briggs and others that King "was struck four days prior to being found unresponsive."  (See id. ¶¶ 50, 52).  Dauphin County officials held a press conference soon after King's death, at which they ruled out bringing homicide charges against Caputo for the August 9 assault, deeming it self-defense.  (See id. ¶ 54).  No criminal charges have been filed in connection with King's death.  (See id.)

White believes the failure to accurately document King's injuries or CO Rodriguez's role in causing them is evidence of an ongoing conspiracy to cover up the circumstances of his death and to protect Dauphin County from liability. (See id. ¶¶ 53, 55-57; see also id. ¶¶ 121-123).  White commenced the instant lawsuit on August 29, 2022, and we subsequently granted him leave to file a second amended complaint.  Therein, he accuses all defendants of deliberate indifference to the foreseeable risk that King "would be assaulted by his cellmate, another inmate, and/or prison staff."  (See id. ¶¶ 58-60).  Highlighting the deaths of at least 20 inmates at the prison between 2008 and 2019, including five "in 2021 alone," White alleges Dauphin County has a longstanding policy or practice of condoning or acquiescing in the violation of pretrial detainees' constitutional rights.  (See id. ¶¶ 75-88; see also id. ¶¶ 99-108).  He likewise accuses the PrimeCare defendants of

systematically denying adequate medical care to inmates.  (See id. ¶¶ 90-97; see also id. ¶¶ 110-119).

White raises the following eleven claims:

- **Against CO Rodriguez:**  Fourteenth Amendment substantive-due-process violation pursuant to Section 1983 for excessive force (Count I).

- **Against Dauphin County:**  Municipal liability pursuant to Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978), for excessive force and "cover up" (Count III).

- **Against Warden Briggs and the remaining CO defendants:**  Supervisory liability for excessive force (Count V).

- **Against all PrimeCare defendants:**  Substantive-due-process violation pursuant to Section 1983 for denial of adequate medical care (Count II), supervisory liability for denying medical care (Count VI), and common-law negligence, gross negligence, and vicarious liability (Count VIII).

- **Against PrimeCare Medical, Weber, and Dr. Hoffman:**  Monell liability for denying medical care (Count IV).

- **Against PrimeCare Medical:**  Common-law corporate negligence and gross negligence (Count IX).

- **Against all individually named defendants:**  Civil conspiracy pursuant to Section 1983 (Count VII).

- **Against all defendants:**  Wrongful death (Count X) and survivor action (Count XI) pursuant to 42 PA. CONS. STAT. §§ 8301, 8302.

Defendants move to dismiss White's second amended complaint under Rule 12(b)(6) for failure to state a claim.[6]  The motions are fully briefed and ripe for disposition.

---

[6] White does not oppose the PrimeCare defendants' motion to dismiss Counts IV, VI, and VII.  (See Doc 84 at 6; Doc. 87 at 6; Doc. 93 at 5; Doc. 97 at 2).

## II.   <u>Legal Standard</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. <u>See</u> FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (quoting <u>Pinker v. Roche Holdings, Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." <u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d Cir. 2010) (citing <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Phillips</u>, 515 F.3d at 232 (alteration in original) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  <u>See</u> <u>Santiago v. Warminster Township</u>, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  <u>Id.</u> at 130 (alteration in original) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal

conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578

F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual

allegations, it must determine whether they are sufficient to show a "plausible claim

for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550

U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 556 U.S. at 678.

## III.   **Discussion**

Defendants reiterate many arguments of their previous motions to dismiss.

As before, we will start with the Dauphin County defendants' resort to qualified

immunity and Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA"),

42 PA. CONS. STAT. § 8541 *et seq.*, in response to White's supervisory liability claim

under Section 1983 and his state-law claims, respectively.  (See Doc. 96 at 12-15, 17-

20).

### A.    **Immunity**

#### 1.    *Qualified Immunity*

Qualified immunity protects a state actor who has committed a constitutional

violation if the plaintiff's rights were not "clearly established" when the individual

acted.  Pearson v. Callahan, 555 U.S. 223, 243-45 (2009).  Liability will not attach if a

reasonable actor could have believed the challenged conduct complied with settled

law.  See id. at 244; see also Springer v. Henry, 435 F.3d 268, 280 (3d Cir. 2006).  The

doctrine cloaks government officials with "immunity from suit rather than a mere

defense to liability," see Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis

omitted), and "ensure[s] that insubstantial claims against government officials [will] be resolved prior to discovery," Pearson, 555 U.S. at 231-32 (second alteration in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987)).  The defense generally "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Defendants bear the burden of establishing qualified immunity.  See Beers–Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).  Faced with such a defense, a court must consider two distinct inquiries: whether, viewing the facts alleged in a light most favorable to the plaintiff, defendants violated a constitutional right and, if so, whether the right was "clearly established" at the time of the alleged violation.  Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232).  We may begin our analysis with either prong.  See Pearson, 555 U.S. at 237.

Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights but serves as a mechanism for vindicating rights otherwise protected by federal law.  See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, a plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  See Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d

Cir. 1995)).  No one disputes that the Dauphin County and CO defendants are state actors.  Our sole inquiry is whether White has alleged a constitutional violation.

When we last had occasion to consider the sufficiency of White's allegations, we concluded that he failed to plead a constitutional violation against any of the CO defendants and that this deficiency was fatal to his supervisory liability claim against Warden Briggs.  (See Doc. 64 at 9-11).  Our conclusion turned upon White's failure to plausibly allege, *inter alia*, that "any of the CO defendants . . . personally struck King in the face with a tablet" on August 14, 2020.  (See id. at 10).  The second amended complaint now squarely implicates CO Rodriguez in that assault.  (See Doc. 74 ¶¶ 30-32).  In response, the Dauphin County defendants spill much ink denying that White's refined theory of the case cures his earlier omission, deriding his new allegations as "speculative" and "conclusory."  (See Doc. 96 at 6-8, 10-11; Doc. 104 at 1-7, 16-18).  They are mistaken.  White's claims against CO Rodriguez are the type of concrete factual allegations that we must accept as true at this juncture.  See Phillips, 515 F.3d at 233.  He now plausibly asserts a violation of King's right to be free from excessive force that is clearly established in this circuit.  See Hudson v. McMillian, 503 U.S. 1, 6-7 (1992) (citing Whitley v. Albers, 475 U.S. 312 (1986)).  That conclusion necessarily requires us to reconsider the plausibility of White's claim against Warden Briggs.

White still does not assert that the warden was personally involved in the attack, so the only basis for supervisory liability would be if he knew CO Rodriguez would use excessive force against King and acquiesced in the violation or if he maintained a policy or custom of ignoring attacks on prisoners by correctional

officers.  See Parkell v. Danberg, 833 F.3d 313, 330 (3d Cir. 2016) (citing Santiago, 629 F.3d at 129 n.5).  The second amended complaint does not suggest Warden Briggs knew the assault would happen, so we will focus on the custom-or-policy theory.  Our court of appeals has explained that defendants in supervisory roles may be liable if they "established and maintained a policy, practice[,] or custom which directly caused [the] constitutional harm."  Santiago, 629 F.3d at 129 n.5 (second alteration in original) (quoting A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004)).  To succeed, a plaintiff must allege that the supervisory defendant is a governmental actor with "final policymaking authority" who either promulgated or enforced the policies that were directly responsible for the injuries asserted.  Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 223 (3d Cir. 2015) (quoting Sample v. Diecks, 885 F.2d 1099, 114, 118 (3d Cir. 1989)).  A pattern of past constitutional violations typically will put a municipal actor on notice that existing training or policies are constitutionally deficient, so "continued adherence to the original practices will demonstrate the 'conscious disregard' required to establish deliberate indifference."  McCracken v. Fulton County, No. 3:19-CV-1063, 2020 WL 2767577, at *8 (M.D. Pa. May 28, 2020) (Conner, C.J.) (citing Thomas v. Cumberland County, 749 F.3d 217, 223 (3d Cir. 2014); Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000)).

White alleges that both Dauphin County and Warden Briggs have long maintained customs, policies, or practices of "condoning and/or acquiescing" in the "unlawful assault and battery of and use of excessive force against pretrial detainees by prison staff," (See Doc. 74 ¶¶ 75, 99); of "failing to adequately test, hire,

train, supervise, and discipline prison staff . . . regarding appropriate procedures for use of force against pretrial detainees," (see id. ¶¶ 76, 100); and of failing to adopt or enforce "appropriate use of force procedures, policies, and training to prevent prison staff from assaulting, battering, and otherwise using excessive force against inmates," (see id. ¶¶ 78, 102).  As White sees it, both defendants have known of these customs and policies "for a substantial period of time" and have remained "deliberately indifferent to the systematic abuses" of inmates they facilitate.  (See id. ¶¶ 79-80, 103-104).  He points to numerous past investigations of excessive force claims at Dauphin County Prison, including at least twenty by the county's District Attorney in 2007, and several others that local journalists "discovered" more recently.  (See id. ¶¶ 81, 105 (citations omitted)).  It is not for us to decide whether these allegations are true; discovery will test their veracity.  At this stage, though, White has adequately stated a claim for supervisory liability against Warden Briggs arising from his alleged deliberate indifference to the risk that King would be subject to excessive force by a correctional officer.  We will deny the warden's motion to dismiss Count V.

### 2.    *PSTCA*

The PSTCA grants immunity from liability to local agencies and their employees "for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."  See 42 PA. CONS. STAT. § 8541.  The statute's principal purpose "is to limit governmental exposure to tort liability for its acts."  Sphere Drake Ins. Co. v. Phila. Gas Works, 782 A.2d 510, 515 (Pa. 2001) (citing Lory v. City of Philadelphia, 674 A.2d

673, 675-76 (Pa. 1996)).  The requisites for invoking immunity under the PSTCA differ depending on the tort (*i.e.*, negligent vs. intentional) and the defendant (*i.e.*, agency vs. employee).  Given these distinctions, we previously addressed the viability of Dauphin County's immunity defense separately from that of Warden Briggs and the CO defendants.  (See Doc. 64 at 11-13).  We dismissed the wrongful death and survivor action claims against Dauphin County with prejudice, (see id. at 12-13), and White did not seek reconsideration of that decision.  Accordingly, we will summarily grant the county's renewed motion to dismiss the corresponding claims that appear in Counts X and XI of the second amended complaint.

With respect to Warden Briggs, we note that the PSTCA exempts from its protective scope any employee whose act constitutes "a crime, actual fraud, actual malice or willful misconduct."  See 42 PA. CONS. STAT. § 8540.  Willful misconduct is more than recklessness or deliberate indifference.  See Bright v. Westmoreland County, 443 F.3d 276, 287 (3d Cir. 2006) (citing Williams v. City of Philadelphia, 569 A.2d 419, 421-22 (Pa. Commw. Ct. 1995)).  It includes only such conduct that shows an employee "desired to bring about the result that followed" or "was aware that it was substantially certain to follow, so that such desire can be implied."  See Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006) (quoting Renk v. City of Pittsburgh, 641 A.2d 389, 293 (Pa. 1994)).  White has adequately pled that CO Rodriguez engaged in willful misconduct that brought about King's injuries.  But Warden Briggs' liability as a supervisor is predicated solely on his deliberate indifference that such harm might result, not his willful efforts to see it come to fruition.  The PSTCA thus

immunizes him from liability to the same extent as Dauphin County with respect to Counts X and XI. We will dismiss these counts with prejudice.

### B.   Count III: Section 1983 – <u>Monell</u> – Excessive Force and Cover-Up (Dauphin County)

Like his supervisory liability claim against Warden Briggs, White advances a theory of municipal liability against Dauphin County for allegedly establishing a policy or failing to properly train correctional officers in a way that led to the excessive use of force against King. (<u>See</u> Doc. 74 ¶¶ 75-88). He also claims the county maintains a policy, practice, or custom of covering up the unlawful actions of correctional officers and medical staff "in an effort to avoid blame and liability"— especially when inmates die. (<u>See</u> <u>id.</u> ¶¶ 75-88).

Municipal liability arises when a governmental entity causes an employee to violate another's constitutional rights by an official custom or policy. <u>See</u> <u>Monell</u>, 436 U.S. at 690-94; <u>Montgomery v. De Simone</u>, 159 F.3d 120, 126 (3d Cir. 1998). To establish liability, a plaintiff must identify the challenged policy or custom, attribute it to the municipality itself, and show a causal link between execution of the policy or custom and the injury suffered. <u>See</u> <u>Losch v. Borough of Parkesburg</u>, 736 F.2d 903, 910 (3d Cir. 1984). A policy exists "when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation or edict." <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting <u>Pembaur v. Cincinnati</u>, 475 U.S. 469, 481 (1986)). Customs may be formed when "'the practices of state officials [are] so permanent and well settled' as to virtually constitute law." <u>Id.</u> (quoting <u>Monell</u>, 436 U.S. at 691).

Municipalities may be held liable for constitutional violations that result from inadequately training their employees if the failure to train constitutes a custom of the municipality.  See Connick v. Thompson, 563 U.S. 51, 61 (2011).  The failure must reflect "deliberate indifference to the [constitutional] rights of persons with whom [municipal employees] come into contact."  Colburn v. Upper Darby Township, 946 F.2d 1017, 1028 (3d Cir. 1991) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  A showing of deliberate indifference requires that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."  Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999).  Plaintiffs typically must show a "pattern of similar [constitutional] violations" to prove deliberate indifference in the failure-to-train context.  See Connick, 563 U.S. at 63.[7]

### 1.   *Excessive Force*

White's claim against Dauphin County with respect to excessive uses of force is virtually identical to the supervisory liability claim against Warden Briggs that we already found to be sufficient.  The second amended complaint plausibly sets forth a claim that King's injuries resulted from a correctional officer's use of force, and

---

[7] A single constitutional violation could suffice to establish municipal liability if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that policymakers reasonably can be charged with deliberate indifference.  See City of Canton v. Harris, 489 U.S. 378, 390 (1989).  White does not present a single-violation theory.

that such force was inflicted pursuant to official prison policy or resulted from inadequate training.  Thus, we will deny the county's motion to dismiss this aspect of Count III.

### 2.   *Cover-Up*

Courts approach cover-up claims in one of two ways depending upon the specific allegations.  The first approach assesses the claimed cover-up as an effort to deny the "right of access to the courts" guaranteed by the Fourteenth Amendment. See Estate of Smith v. Marasco, 318 F.3d 497, 511 (3d Cir. 2003) (collecting cases); see also Jutrowski v. Township of Riverdale, 904 F.3d 280, 294 (3d Cir. 2018).  A state official violates the Fourteenth Amendment by "wrongfully and intentionally conceal[ing] information crucial to a person's ability to obtain redress through the courts" if (1) they do so purposely to frustrate that right and (2) their concealment engenders delay that "substantially reduce[s] the likelihood" the plaintiff can obtain relief to which they are entitled.  See Estate of Smith, 318 F.3d at 511 (quoting Swekel v. City of River Rouge, 119 F.3d 1259, 1262-63 (6th Cir. 1997)).  In other words, plaintiffs raising this species of constitutional violation must allege conduct that either prevented them from bringing a lawsuit or rendered their "access to the court ineffective or meaningless."  See id. (citing Swekel, 119 F.3d at 1261-64).  The second approach simply considers the allegation part and parcel of a general conspiracy to violate some other constitutional right.  See, e.g., Simonton v. Tennis, No. 1:09-CV-233, 2011 WL 941406, at *2-3 (M.D. Pa. Mar. 16, 2011) (Conner, J.), aff'd 437 F. App'x 60, 63 (3d Cir. 2011) (nonprecedential).

White alleges Dauphin County maintained a policy of covering up unlawful acts supposedly committed by correctional officers and medical staff, though he does so within his overarching claim of municipal liability for condoning the excessive use of force, a distinct constitutional violation.  (See Doc. 74 ¶¶ 83-86, 88). We previously dismissed this claim with leave to amend because White did not "specifically aver Dauphin County purposely endeavored to prevent him from vindicating his or King's rights in court, or that the alleged concealment engendered delay or reduced his likelihood of obtaining relief."  (See Doc. 64 at 17). Dauphin County correctly notes that the only revision White made to this portion of his pleadings was to "remove[] Warden Briggs from the averments."  (See Doc. 96 at 9).  White rejoins that he did not need to "specifically use the magic words 'access to the courts' . . . to state a claim" because the court can infer that court access is the constitutional right to which he was referring.  (See Doc. 103 at 12 (highlighting allegations that defendants acted in concert "to violate Plaintiff's constitutional rights in the ways described above" in order "to protect the County from liability" (quoting Doc. 75 ¶¶ 53, 121, 122)).

Magic words or not, White was on notice that his amended complaint failed to state a claim against Dauphin County for denying his or King's right of access to the courts because he did not allege that the defendants' actions delayed or reduced his likelihood of obtaining relief.  (See Doc. 64 at 17).  He made no effort in his second amended complaint to cure the deficiencies we identified.  Two of the three paragraphs he now relies upon are identical in both versions of the complaint, (compare Doc. 75 ¶¶ 121, 122, with Doc. 27 ¶¶ 128, 129), and the third uses a

phrase—"to protect the County from liability," (see Doc. 75 ¶ 53)—so capacious that neither the court nor the county can confidently say what theory of liability he meant to convey.  Nor did he revise his pleadings to address how "the defendants' efforts either prevented [him] from filing suit or rendered [his] access to the courts ineffective or meaningless."  See Estate of Smith, 318 F.3d at 512.  White's attempt to clarify or explain away his questionable litigation strategy in his opposition brief are unpersuasive and untimely in any event.  See Jefferies v. Ameriquest Mortg. Co., 543 F. Supp. 2d 368, 385 (E.D. Pa. 2008) (rejecting plaintiff's attempt to raise new claim in opposition brief) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 499 (3d Cir. 1997)).  We will dismiss this aspect of Count III with prejudice.[8]

The second amended complaint elsewhere identifies "acts in furtherance of the conspiracy," including, *inter alia*, "covering-up [*sic*] assaults by Correctional Officers and/or inmates . . . and ignoring or covering up the failure of [the PrimeCare defendants] to provide adequate medical care to the inmates."  (See Doc. 74 ¶ 122).  White situates these allegations in Count VII, his Section 1983 conspiracy claim.  We address that claim in Part III.D.

---

[8] Although we dismiss White's freestanding cover-up claim, we do not intend to suggest that discoverable evidence of Dauphin County's lack of candor in its investigative reports of King's injuries and death or its efforts to minimize or avoid liability is irrelevant moving forward.  Indeed, such evidence may be relevant to the issue of punitive damages.

C.    **Count II: Section 1983 – Denial of Adequate Medical Care (All PrimeCare Defendants)**

White maintains individual-capacity claims against Weber, Dr. Hoffman, and more than two dozen members of Dauphin County Prison's medical staff for denying King adequate medical care.  (See Doc. 74 ¶¶ 67-73).  Pretrial detainees may assert a Section 1983 claim for inadequate medical care under the Fourteenth Amendment as a violation of their right to due process.  See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003); Colburn v. Upper Darby Township, 838 F.2d 663, 668 (3d Cir. 1988).  The protections afforded to pretrial detainees under the Fourteenth Amendment are "at least as great as" those guaranteed to convicted prisoners under the Eighth Amendment.  See Natale, 318 F.3d at 581 (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)).

To establish an Eighth Amendment claim arising from deprivation of medical care, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  Id. at 582 (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention."  Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).  Additionally, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment."  Id. (citation omitted).

19

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." See Farmer v. Brennan, 511 U.S. 825, 837 (1994). Mere differences of opinion between the prison's medical staff and the inmate regarding diagnosis or treatment rendered does not support a constitutional violation. See Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988) (citing Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)); see also McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981). Courts are "reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." Palakovic v. Wetzel, 854 F.3d 209, 228 (3d Cir. 2017) (quoting United States ex rel. Walker v. Fayette County, 599 F.2d 573, 575 (3d Cir. 1979)). Federal courts generally defer to prison medical staff with respect to diagnosing and treating prisoners, and "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." Id. (quoting Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)).

White once again asserts that each individual PrimeCare defendant was deliberately indifferent to King's injuries because they failed to properly diagnose his TBI or "provide treatment for his condition." (See Doc. 74 ¶¶ 71-72). And we reiterate that King's injuries plainly constituted a serious medical need when considered with the benefit of hindsight, and the symptoms he complained of—

20

severe headaches, chest pain, breathing problems, sleeping difficulties, and a potential brain bleed, (see id. ¶¶ 36, 37)—provided the facts necessary to infer his needs were serious.  What distinguishes White's second amended complaint from his prior pleadings is that he now plausibly alleges—with the benefit of primary source documentation—that prison medical staff knew of King's serious medical needs but disregarded them after the second assault on August 14, 2020.

White specifically avers that the medical unit only X-rayed King after the first assault, not the second, even though the latter "caused a contusion above his right eye."  (See Doc. 74 ¶¶ 28, 34).  He also alleges that a CT scan of King's head—not an X-ray of his occipital bone—was necessary to diagnose a brain injury.  (See id. ¶¶ 28, 29)).  King's prison medical history report demonstrates that medical staff failed to follow up on the second assault with any type of diagnostic imaging.  (See Doc. 74, Ex. B at ECF 55; Ex. C at ECF 56).  Moreover, White has proffered a handwritten note showing that a correctional officer notified medical staff that King expressly complained of a brain bleed on the night of August 19, but the staff declined to do anything more for him after dispensing a pain reliever (Tylenol) and an anti-inflammatory (Motrin).  (See Doc. 74, Ex. C at ECF 56-57).  Taken together, these allegations suffice to state a claim for deliberate indifference to the "substantial risk of serious harm" King faced from head injuries of which prison medical staff undoubtedly were aware.  See Farmer, 511 U.S. at 837.  We will deny the PrimeCare defendants' motions to dismiss Count II.

**D.    Count VII: Section 1983 – Conspiracy (Warden Briggs and the Remaining CO Defendants)[9]**

White alleges that Warden Briggs and the remaining CO defendants conspired to violate King's rights by, *inter alia*, downplaying and ignoring his injuries and covering up the assaults and lack of adequate medical care. (See Doc. 74 ¶ 122). To state a claim for civil conspiracy under Section 1983, a plaintiff must plausibly allege that "persons acting under color of state law conspired to deprive him of a federally protected right." Ridgewood Bd. of Educ. v. N.E. *ex rel.* M.E., 172 F.3d 238, 254 (3d Cir. 1999) (citing Dennis v. Sparks, 449 U.S. 24, 29 (1980); Lake v. Arnold, 112 F.3d 682, 689 (3d Cir. 1997)). In Pennsylvania, the essential elements of a civil conspiracy are: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003) (quoting Strickland v. Univ. of Scranton, 700 A.2d 979, 987-88 (Pa. Super. Ct. 1997)). A civil conspiracy claim "rises and falls" with the underlying constitutional violation. See Fantone v. Latini, 780 F.3d 184, 191 (3d Cir. 2015), as amended (Mar. 24, 2015) (citing Perano v. Township of Tilden, 423 F. App'x 234, 239 (3d Cir. 2011) (nonprecedential)).

The prior version of White's conspiracy claim failed because he did not "plausibly allege[] defendants violated his constitutional rights." (See Doc. 64 at 21-

---

[9] White has since dropped the PrimeCare defendants from his conspiracy claim. (See Doc. 97 at 2).

22).  Now that he has adequately pled CO Rodriguez used excessive force in causing King's injuries, we must assess his conspiracy claim anew through that lens. Among the acts White claims were done in furtherance of the conspiracy, he cites the defendants' failure to document the second assault, and CO Rodriguez's involvement as the perpetrator, in the Extraordinary Occurrence Report the prison issued after the August 14 incident.  (See Doc. 74 ¶¶ 52, 53, 55).  According to White, that report only mentions that King poured liquid on another inmate.  (See id. ¶ 52). He says "there is absolutely no record of" the second assault and that Warden Briggs and the other defendants "deny that it occurred."  (See id. ¶ 56).  White believes the intentional omission of key details of the August 14 assault, and the effort to blame King's death on the earlier attack by Caputo "despite evidence to the contrary," was meant "to protect the County from liability."  (See id. ¶¶ 53, 57). These allegations all speak to a cover-up conspiracy, not a conspiracy to use excessive force; indeed, White concedes as much.  (See Doc. 103 at 9 ("[T]he Conspiracy Claim is not alleging that Briggs conspired with Rodriguez to use excessive force, but rather that Briggs conspired to cover up Rodriguez's use of excessive force thereby impeding [White's] access to the courts.")).  The cover-up claim fails for the reasons stated above.  See supra Part III.B.2.

White's concession aside, we note that any attempt to derive an excessive-force conspiracy claim from the allegations before us would fail because he has not plausibly alleged a meeting of the minds to use force against King.  Moreover, although White contends that the defendants conspired to deny King treatment following both assaults, which he attributes to the fact that King's attacker was a

correctional officer, (see Doc. 74 ¶¶ 34, 122), his decision to remove the PrimeCare defendants from the conspiracy charge significantly undercuts his ability to maintain that claim against Warden Briggs and the remaining CO defendants, whose role in rendering care is not apparent from the second amended complaint. We find those aspects of the conspiracy charge implausible as alleged against these non-medical defendants as well.  Accordingly, we will dismiss Count VII with prejudice.

### E.    Count VIII: Negligence, Gross Negligence, and Vicarious Liability (All PrimeCare Defendants)

White charges the individual PrimeCare defendants with negligence, and he seeks to hold PrimeCare vicariously liable for its employees' conduct.  (See Doc. 74 ¶¶ 124-130).  We determined that he plausibly set forth those claims in our prior opinion.  (See Doc. 64 at 22-24).  Notwithstanding that ruling, defendant Dr. Garrett Rosas, a licensed "psychologist on the PrimeCare staff," (see Doc. 95 at 13), filed his own motion to dismiss to relitigate those earlier issues—or to litigate them in the first instance, as it were, (see Doc. 84).  In particular, Dr. Rosas argues that the second amended complaint fails to comply with Rule 8 of the Federal Rules of Civil Procedure because it does not "specify what [he] is alleged to have done, or failed to do."  (See Doc. 95 at 10-12).  He does not explain why he declined to raise this objection sooner or to seek reconsideration of our previous decision.

White did not revise this aspect of his amended complaint, and it would be unfair to make him defend against Dr. Rosas' belated arguments now after providing our assurances that the negligence claims against the PrimeCare

defendants survived their first efforts at dismissal.  To be sure, Dr. Rosas' defense that he had no say in King's medical treatment as a prison psychologist and thus stands apart from the other medical defendants might be compelling and perhaps dispositive of the claims against him.  (See id. at 13).  We expect his role and that of the other PrimeCare defendants to "become clear during discovery."  (See Doc. 64 at 24).  They may then seek summary judgment or a stipulated dismissal as appropriate.  For now, though, we reaffirm the sufficiency of Count VIII as pled.[10]

### F.    Counts X and XI: Wrongful Death and Survival Action (All Defendants)

White asserts claims against all defendants under Pennsylvania's wrongful-death and survival statutes.  See 42 PA. CONS. STAT. §§ 8301, 8302.  Neither statute creates an independent cause of action; "rather, they are derivative in the sense that the substance of the claim derives from the injury to the decedent."  See McCracken, 2020 WL 2767577, at *10 (citing Pisano v. Extendicare Homes, Inc., 77 A.3d 651, 660 (Pa. Super. Ct. 2013) (quoting Kaczorowski v. Kalkosinski, 184 A. 663, 664 (Pa. 1936))).  In other words, without an underlying tort, "there can be no wrongful-death or survival action."  Id. (citations omitted).  We have already dismissed these counts against Dauphin County with prejudice on immunity grounds under the PSTCA.  (See Doc. 64 at 24-25); see also supra Part III.A.2. White's claims against Warden Briggs fail for similar reasons.  The claims against

---

[10] Dr. Rosas also moves to dismiss Count IX, which charges PrimeCare Medical with corporate and gross negligence.  (See Doc. 74 ¶¶ 131-134).  PrimeCare declined to seek dismissal of that count, (see Doc. 33 at 3), and Dr. Rosas is not charged with liability therein, so we will deny his motion as to that claim as well.

the remaining CO defendants survive, however, because they did not seek

dismissal.  We will deny Dr. Rosas' motion insofar as White has "state[d] a valid

claim for medical malpractice against the PrimeCare defendants."  (<u>See</u> Doc. 64

at 25).

> **G.     No Further Leave to Amend**

White has amended his complaint twice, most recently with leave of court.

Although he successfully cured some of the problems we identified in our previous

opinion, several deficiencies remain.  We will deny further leave to amend because

we believe such efforts would be futile.  <u>See</u> <u>Grayson v. Mayview State Hosp.</u>, 293

F.3d 103, 108 (3d Cir. 2002).

## IV.   <u>Conclusion</u>

We will grant in part and deny in part defendants' motions to dismiss.  An

appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    June 18, 2024